**UNITED STATES of America,**
**Plaintiff,**

v.

**CENTRAL STATES THEATRE CORPO-**
**RATION, Center Drive-In Theatre**
**Company,**
**and**
**Midwest Drive-In Theatre Company, De-**
**fendants, and Frank D. Rubel, Addi-**
**tional Defendant.**

**Civ. No. 0117.**

United States District Court
D. Nebraska.

Aug. 29, 1960.

Earl A. Jinkinson, Francis C. Hoyt, and Joseph E. Paige, Attys., Dept. of Justice, Chicago, Ill., and William C. Spire, U. S. Atty., Omaha, Neb., for plaintiff.

Yale C. Holland, Clarence E. Heaney, Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for all defendants.[1]

Yale Richards, Omaha, Neb., for defendant, Midwest Drive-In Theatre Co.

DELEHANT, District Judge.

Relying upon the jurisdictional grant of Title 15 U.S.C.A. § 4, plaintiff instituted this proceeding to obtain injunctive relief against the defendants, and each of them forbidding their violation of Title 15 U.S.C.A. § 1, upon whose alleged earlier violation, infra, the prayer was premised. The action was brought in the first instance only against the three corporate defendants. The individual defendant was later brought into it upon motion. The complaint will first be summarized at some length. Thereafter, the general nature of the answers of the defendants will be noted briefly.

The complaint, as amended, first identifies the parties defendant, whose correct identification, varying in some measure from the original averments of the complaint, will be reflected in the findings of fact, infra, and alleges (a) that defendant, Central States Theatre Corporation, manages 76th and West Dodge Drive-In Theatre, Omaha, Nebraska, and Council Bluffs Drive-In Theatre, Council Bluffs, Iowa; (b) that defendant, Frank D. Rubel, of Des Moines, Iowa, is District Manager of Central States Theatre Corporation, and is film buyer for and in charge of operations of the two drive-in theatres mentioned in the last preceding clause hereof; (c) that defendant, Center Drive-In Theatre Company owns and operates 84th and Center Drive-In Theatre, Omaha, Nebraska; and that defendant, Midwest Drive-In Theatre Company, owns and operates Airport Drive-In Theatre, Carter Lake, Iowa. It then defines a "Drive-In Theatre" as "an open air motion picture theatre so provided with roadways, parking areas, sound amplifiers, and motion picture screens as to permit its patrons to drive into the theatre area in automobiles, and to park in such a manner that they may view the performance from their automobiles." And it utilizes the characterization, "Omaha area," which it defines as "the area included in the Counties of Washington, Douglas and Sarpy, in Nebraska, and the Counties of Pottawattamie and Mills, in Iowa." It next, in a sequence of four paragraphs copied verbatim in a footnote[2] hereto, alleges that

1. It should, perhaps, be observed that some changes in the representation by counsel of certain defendants have occurred during the pendency of the action. The answer of defendant Center Drive-In Theatre Company was served and filed in its behalf by Mr. Edward G. Garvey and the Honorable Richard E. Robinson, both of Omaha, Neb. Mr. Robinson, shortly thereafter, became a Judge, and is now the Chief Judge, of this court. Mr. Garvey later discontinued his participation in the litigation. And upon the trial, and in the submission of the case, Messrs. Holland and Heaney represented the defendant, Center Drive-In Theatre Company. From the inception of the case until and through its formal trial, in addition to Mr. Richards, Mr. Eugene N. Blazer, of Omaha, Neb., represented the defendant, Midwest Drive-In Theatre Company. But, shortly after the trial and before the submission of briefs, Mr. Blazer died. Thereupon, Messrs. Holland and Heaney joined Mr. Richards in the presentation of the position of defendant Midwest Drive-In Theatre Company.

2. Here are set out paragraphs numbered 7, 8, 9 and 10 of the complaint:

"7. Motion picture distributors enter into contracts with each of the defendants pursuant to which the distributors lease motion picture film to each of said defendants and license each of them to exhibit said film in its theatres. Said contracts are usually made when the film is outside the Omaha area and require defendant corporations to return the film to the distributors after it has been exhibited in defendants' theatres.

"8. Substantially all of the film projected on the screens of drive-in theatres in the Omaha area, including defendants' theatres, has been made in States other than Nebraska and Iowa and shipped in interstate commerce from the State of origin into Nebraska and Iowa and exhibited in drive-in theatres. This film moves in interstate commerce from the place of

the "Drive-In Theatre" operation in the "Omaha area" substantially involves and affects interstate commerce, and that The Omaha World Herald, a daily newspaper published in Omaha, is regularly utilized by operators of such theatres as an advertising medium.

The complaint, thereupon, avers that, beginning on or about February 4, 1955, and continuing thereafter up to and including its filing, the defendants, and others unknown to plaintiff, had been engaged in a combination and conspiracy in unreasonable restraint of the trade and commerce defined in footnote 2 hereof, in violation of Title 15 U.S.C.A. § 1, and were continuing, and unless enjoined therefrom, would continue such offense. That combination and conspiracy are asserted to consist of a continuing agreement, understanding, and concert of action among the defendants, the substantial terms of which had been, and were, that they agreed:

"(a) To fix, establish, and maintain uniform and non-competitive prices to be charged for admission to defendants' theatres;

"(b) To fix, establish and maintain maximum dollar amounts for newspaper advertising to be expended by or on behalf of defendants' theatres;

"(c) To fix, establish and maintain uniform and non-competitive prices to be charged for food and beverages sold at defendants' theatres;

"(d) To threaten to refrain from dealing with distributors who provide pictures to drive-in theatres for exhibition at admission prices below those agreed upon by defendants."

That allegation is followed by another to the effect that in carrying out and effectuating such combination and conspiracy, the defendants had done those things which, it had theretofore been alleged, supra, they had conspired and agreed to do.

Finally, the complaint alleges that the asserted combination and conspiracy had the following effects, among others:

"(a) Members of the public are denied the opportunity of seeing motion pictures at drive-in theatres in the Omaha area, in Nebraska and Iowa at admission prices determined in a free, competitive market;

"(b) Distributors are deprived of the benefits of a free, competitive market for the motion pictures distributed by them in interstate commerce in the Omaha area;

"(c) The volume of theatre advertising purchased by defendants from newspapers circulating in interstate commerce is substantially lessened."

manufacture to film distributors in the City of Omaha. It is then shown in conventional theatres in downtown Omaha and in conventional theatres in other cities in Iowa, Minnesota and South Dakota. Following these exhibitions the film moves in interstate commerce to the Omaha area for exhibition in the drive-in theatres, including defendants' theatres, located in both Nebraska and Iowa. After exhibition in defendants' theatres the film is again transported in interstate commerce to other States for exhibition, storage or destruction.

"9. A substantial number of contracts for film exhibition in the Omaha area provide that the defendants shall pay to distributors, for the privilege of exhibiting the film, a percentage of the box office receipts obtained from exhibiting the film in defendants' theatres. Thus, there is a direct relationship between the price charged for admission to defendants' theatres and the price paid by defendant corporations to the distributors for leasing film. The interstate movement of film is directly affected by the prices charged for admission to defendants' theatres.

"10. As a part of their endeavor to secure patronage for defendants' theatres and to inform the public of the films to be shown in said theatres, the defendants advertise, among other ways, in the Omaha World Herald, a daily newspaper published in the City of Omaha and circulated from Omaha to many points in Nebraska, Iowa and other States."

And in its complaint, plaintiff prays:

"1. That the aforesaid combination and conspiracy among the defendants in restraint of interstate trade and commerce be adjudged and ·decreed to be in violation of Section 1 of the Sherman Act.

"2. That the defendants and their officers, directors, agents, representatives, and all persons acting, or claiming to act on their behalf, be perpetually enjoined from being a party to agreements, contracts, relationships, understandings, or practices having the purpose or effect of continuing, reviving, or renewing any of the violations of the Sherman Act hereinbefore set forth and described.

"3. That the plaintiff may have such other, further, and different relief as the nature of the case may require and to the Court may seem just and proper.

"4. That the plaintiff recover its taxable costs."

By way of answer, defendant, Central States Theatre Corporation, admits that it is a corporation (though it mistakenly admits that, as originally alleged in the complaint, it is incorporated in Iowa), that substantially all films exhibited in theatres in or near Omaha, Nebraska, are made in states other than Nebraska or Iowa, and that plaintiff's definition of a "Drive-In Theatre" is "fairly comprehensive," and, for the rest either categorically denies, or denies its possession of information respecting the truth of, the other allegations of the complaint. Its denial of its own management of 76th and West Dodge Drive-In Theatre, and of Council Bluffs Drive-In Theatre, is supplemented and amplified by allegations (a) that by contract Smith Management Company, of Boston, Massachusetts manages those theatres, but has committed the supervision and control of their actual operation and management, including the procurement of pictures for exhibition in such theatres, to defendant, Frank D. Rubel, as an individual, who receives his compensation for such services directly from the respective corporate owners of such theatres, and (b) that the answering defendant, under arrangement with Smith Management Company, keeps the books and records of those two theatres, rendering accounting therefor to Smith Management Company, and disburses such funds as may be required for the maintenance and operation of such theatres. The denial by that answer of plaintiff's allegations of the inclusion within the reach of interstate commerce of the operation of the drive-in motion picture business in the "Omaha area" is enlarged and amplified by some affirmative allegations touching the transportation of films for use in such operation, and the assertion that the delivery, exhibition and return of such films are entirely intrastate in character. That answering defendant particularly denies that it transacts business, or is found, in the District of Nebraska, and that valid service of summons can be, or has been, made upon it in the District of Nebraska. And it denies both the sufficiency of the averments of the complaint to state a claim upon which the relief prayed for can be granted, and also the jurisdiction of this court either over the person of such defendant, or to grant the relief prayed as against such defendant.

The defendant, Center Drive-In Theatre Company, by answer, admits (a) that it is a corporation formed under the laws of Nebraska, with its principal place of business in Omaha, Nebraska, and transacts business in the District of Nebraska, (b) plaintiff's pleaded definition of "Drive-In Theatre" supra, (c) that motion picture distributors enter into contracts with each of the defendants pursuant to which the distributors lease motion picture films to each of the defendants, and license each of them to exhibit said films in its theatres (which admission the court regards as being operative only in respect of the admitting defendant's own operations and not as attributing a course of action to any

other defendant), (d) that motion picture film exhibited in its theatre has been made in a state or states other than Iowa or Nebraska, and, upon being made is transported from outside Nebraska and Iowa to an exchange or distributing center of the respective film company or distributor (but, making such admission with the affirmative assertion that film "is then at rest"), (e) that a substantial number of contracts for film exhibition in the Omaha area provide that the exhibitor shall pay to distributors for the privilege of exhibiting the film, a percentage of the boxoffice receipts obtained from exhibiting the film in distributors' theatres, and (f) that, as a part of their endeavor to secure patronage for defendants' theatres, and to inform the public of the films to be shown in their theatres, the defendants advertise, among other ways, in the Omaha World Herald, a daily newspaper published in the City of Omaha, and circulated from Omaha to many points in Nebraska, Iowa, and other states. Otherwise, defendant, Center Drive-In Theatre Company, either denies, or asserts its want of adequate information to support admission, or denial of, the allegations of the complaint. And such defendant asserts that the complaint fails to state a claim against such defendant on which relief can be granted.

By its amended and substituted answer to the complaint, the defendant, Midwest Drive-In Theatre Company [3], admits (a) that it is a corporation organized under the laws of Nebraska, with its principal place of business in Omaha, Nebraska, and up to March 7, 1958 transacted business in Nebraska, but with the qualification that its sole business so transacted was the operation of Airport Drive-In Theatre located in Pottawattamie County, Iowa [4], and that it ceased on March 7, 1958 to transact any business in Nebraska or elsewhere, and since that date has transacted no business; (b) that it was a lessee of Airport Drive-In Theatre from its opening for business until on or about March 7, 1958, when it ceased the operation of such theatre, and that on or about August 6, 1958, it completely divested itself of its lease operations, or any other interest, in such theatre and, ever since that date, has had, and has no right, title or interest of any kind, character or description in such theatre, whether in its real estate, or any personal property, or any interest in its operations, or any right to receive any money, or any interest derived, or to be derived, from such theatre; (c) that plaintiff's definition of "Drive-In Theatre" is correct, and that plaintiff's definition of "Omaha area" is correct; (d) that motion picture distributors enter into contracts with each of the defendants, pursuant to which the distributors lease motion picture film to each of the defendants, and license each of them to exhibit such film in its theatres (understanding this admission as being limited in practical consequence to its own business operations); (e) that the motion picture film exhibited in its theatre was made in a state or states other than Nebraska or Iowa, and, upon being made, was transported from outside Ne-

---

3. The pleading of this defendant, responsive to the complaint, to which alone reference is now made, was served and filed only after considerable portions of successive earlier pleadings for a like purpose had been stricken upon motion at the behest of plaintiff. And, even from the pleading thus finally served and filed, much of its language was similarly stricken. It may be understood, therefore, that the present recollection of the responsive pleading of that defendant has to do with that most recent answer, insofar only as it remains unstricken. For the history of the earlier answers of defendant, Midwest Drive-In Theatre Company, and the action of the court in striking portions thereof, see filings 15, 18, 23, 24, 36, 55, 59, 66 (being the amended and substituted answer as originally filed, portions of which also were later stricken), 67 and 79.

4. This theatre is located in Carter Lake, Iowa. That community is actually a part of metropolitan Omaha, and is on the west side of the Missouri River, as presently located in that segment. But it is a part of the State of Iowa, separated from that state's main body by the river's earlier wandering.

braska and Iowa to an exchange or distributing center of the film company or distributor involved in Omaha, Nebraska, but with the qualification that, once thus arrived, the film "is at rest"; (f) that a substantial number of contracts for film exhibition in the Omaha area provide that the defendants shall pay to distributors, for the privilege of exhibiting the film, a percentage of the box-office receipts obtained from exhibiting such film in the defendants' theatres; and, (g) that the answering defendant, during the time set forth in the complaint, has advertised its theatre, and the motion picture films to be exhibited therein, in Omaha World Herald, a daily newspaper, which is the only daily newspaper published in Omaha, Nebraska, and is (sic) the principal medium used by such defendant in advertising such theatre and film. That answering defendant denies all other averments of the complaint, considering that to be the proper implication of such allegations as are by it said to be factually beyond its knowledge or information.

Defendant, Frank D. Rubel, by his answer to the complaint, admits that plaintiff's definition of "Drive-In Theatre" is fairly comprehensive. And responding to the other allegations of the complaint, he either categorically denies them, or asserts that he is without knowledge or information adequate for his formation of a belief as to their truth. In and by such answer, he also denies that, as to him, this action is controlled or governed by The Sherman Act; asserts that the averments of the complaint are insufficient to state a claim upon which the relief prayed for against him can be granted; and alleges that the court is without jurisdiction over his person, and is without jurisdiction to grant the relief prayed for.

Upon order of the court, a pretrial conference was held, of which a written report was prepared, filed and served (filing 64). It dealt principally with several features calculated to simplify the proofs in the case, and to expedite the trial. It is considered unnecessary

to reflect the contents of the report at this point.

Trial of the action has been had to the court without a jury. The evidence has been received, examined and considered. And exhaustive and competent typewritten briefs have been submitted by counsel, for which the court acknowledges its indebtedness and thorough appreciation.

It may frankly be acknowledged that in the trial and submission of the case, to a degree which is fortunately unusual in this forum, counsel on occasion have adverted to each other, and to witnesses supporting views uncongenial to such counsel, with notable asperity. In their larger part, those manifestations of distemper have simply been disregarded. Their essential impersuasiveness has surely not escaped the recognition of their offerors. An advocate rarely convinces a judge or jury by adopting the antipathies of him, or those whose position he undertakes to support, even though the matter in suit arises in an industry rather too notably plagued with the practice of cannibalism. Saying which, the court now undertakes to assure counsel that in each of the contexts which have evoked their more caustic observations, the court has carefully considered the problem of credibility or probative significance, or both, which is there presented by the record. For the rest, their choler is forgotten. And, having been signified principally in unfiled briefs, it is not a part of the formal record.

The facts are now set out. Most of them are not disputed. But, of the facts vital to the present decision, some are squarely controverted either in their entirety, or to a substantial extent.

For the purposes of this litigation, a "Drive-In Theatre," is agreed to mean, and to be, an open air motion picture theatre so provided with roadways, parking areas, sound amplifiers, and motion picture screens as to permit the patrons to drive into the theatre area in automobiles, and to park in such a manner that the occupants of each such automobile

may view the performance from the automobile in which they are located. For such purposes, too, the term "Omaha area" means the area included in the counties of Washington, Douglas, and Sarpy, in Nebraska, and the counties of Pottawattamie and Mills, in Iowa.

From varying, and generally unestablished, dates before February 4, 1955, and on February 4, 1955, and thereafter to and through the time of the trial of this action, the following drive-in theatres were located, and during their respective "seasons" were operated, in the Omaha area:

(a) *The Sky View Drive-In Theatre* was, and is, located on Military Avenue, at or near 72nd Street, in Omaha, Nebraska. It was, and is, the area's largest drive-in theatre. In 1955 it was, and so far as the court is aware, it still is, owned by Benson Drive-In Corporation, of Omaha [5], and then was, and is, managed by Ralph Blank. Ralph Blank also managed and manages two conventional motion picture theatres in Omaha, the "Admiral" and the "Chief." Neither the corporate owner of Sky View Drive-In Theatre, nor Ralph Blank, is a party to this litigation. But it arose upon the prompting of, and out of a written letter of complaint to the Department of Justice of the United States from, Monsky, Grodinsky, Good & Cohen (through Mr. Paul F. Good, a member of that firm), counsel for Benson Drive-In Corporation, and for Ralph Blank. That letter was written for and in behalf of Benson Drive-In Corporation at the request of, and with the approval of its contents by, Ralph Blank.

(b) *Golden Spike Drive-In Theatre*, is located at 11402 Dodge Street, in Omaha, Nebraska. It was and is owned by a not precisely identified corporation, of which Solomon John Francis was, and is, a shareholder and officer, and an active participant in its business affairs. Mr. Francis was, and is, also Branch Manager in Charge of Sales of Allied Artists, a corporate producer and distributor of motion pictures, through its Omaha and Des Moines offices, and maintains his residence in Omaha. Neither the corporate owner of Golden Spike Drive-In Theatre, nor Solomon John Francis, is a party to this litigation.

(c) *Grand View Drive-In Theatre* was, and is, located either in the extreme southerly part of Omaha, Nebraska, or actually beyond the city limits. It is the smallest drive-in theatre in Omaha. Its ownership and management have not been established. Neither its owner, nor its manager, is a party to this litigation. And beyond the facts of its existence and operation in the Omaha area, it has no present significance.

(d) *76th and West Dodge Drive-In Theatre*, was, and is, located at 76th and Dodge Streets in Omaha, Nebraska. It was, before and during 1955, and still is, owned by Omaha Drive-In Theatre Company, a corporation organized under the laws of Iowa, and duly authorized to do, and doing, business in Nebraska, whose officers and directors were, and are, Phillip Smith, Boston, Massachusetts, President, L. J. Wegener, Des Moines, Iowa, Vice President, Emanual Kurland, Boston, Massachusetts, Secretary, and E. R. Lehman, Des Moines, Iowa, Treasurer. In 1954 and 1955, and for a considerable interval thereafter, one Bernard Dudgeon was the local manager of 76th and West Dodge Drive-In Theatre. However, his managerial authority extended only to the day by day local operation of the theatre, and did not include the formulation or direction of its business program or practices, the procurement of films for exhibition by it, or the management or control of its fiscal affairs. All of those matters were committed to another, or to others, who also had authoritative supervisory control over Mr. Dudgeon, even in respect of those duties whose performance was entrusted to him. The precise identity of such supervisory manager or managers is a question which is sharply controverted. And the facts concerning it, along with the court's find-

5. Concerning whose corporate domicile the record appears to be silent.

ing touching it, are reserved for exposition shortly hereafter. Neither Omaha Drive-In Theatre Company, the corporate owner of 76th and West Dodge Drive-In Theatre,[6] nor Bernard Dudgeon, its local manager, through 1955, and for a considerable interval thereafter, has been made a party defendant hereto.

(e) *Council Bluffs Drive-In Theatre* was, and is, located near the southwesterly limits of Council Bluffs, Iowa. It was, and is, owned by Midway Drive-In Theatre Company, a corporation organized under the laws of Iowa. Its officers and directors were, and are, the same men identified in the last preceding paragraph as the officers and directors of Omaha Drive-In Theatre Company, who severally occupy identical positions and offices in both of the corporations. Through 1954, and until June 1, 1955, one Ted Belles was its local operating manager, and on the date last identified he was succeeded by one Gene Cramm. But what has been said in the last preceding paragraph respecting the limited extent of Bernard Dudgeon's management of 76th and West Dodge Drive-In Theatre applies equally and identically to Ted Belles' management of Council Bluffs Drive-In Theatre, and to the management of Gene Cramm. The subject of its responsible managerial control is also reserved for later attention herein. And in that attention, the two affected theatres will be considered together, for their plight is identical. It is observed that neither Midway Drive-In Theatre Company, nor Ted Belles, nor Gene Cramm, is a party defendant to this case.

(d) *Airport Drive-In Theatre* was, and is, located at Carter Lake, in the state of Iowa, in the neighborhood of the Municipal Airport for the city of Omaha. In 1955, it was owned by Midwest Drive-In Theatre Company, a corporation organized under the laws of Nebraska, with its principal place of business at Omaha,

Nebraska. One J. Robert Hoff, through 1954, on February 4, 1955, and thereafter, until March, 1958, was the president of Midwest Drive-In Theatre Company.[7] In that interval, he was also the directing supervisor of its operations, but one Robert Huntling was its local manager. That was not, and is not, J. Robert Hoff's only, or even his principal, business activity. He was, and is, President of Ballantyne Company, of Omaha, Nebraska, a corporate manufacturer and marketer of motion picture theatre (including drive-in theatres) sound and projection equipment. And he maintains his headquarters in the offices of Ballantyne Company. Midwest Drive-In Theatre Company in March, 1958, subleased its Airport Drive-In Theatre to another unidentified operator, and has not thereafter been, and is not now, engaged in the operation of any theatre. And, in August, 1956, it divested itself entirely of any interest in the theatre property, or any lease thereof. Obviously, Midwest Drive-In Theatre Company is a party defendant to this action. J. Robert Hoff is not.

(g) *84th and Center Drive-In Theatre* is located at 84th and Center Streets in Omaha, Nebraska. It was at all times material herein, and is, owned and operated by Center Drive-In Theatre Company, which is a corporation organized under the laws of Nebraska, with its registered principal place of business in Lincoln, Nebraska. Of that corporation, one Herman S. Gould, at all material times was, and is, Secretary-Treasurer. He was, and is, also the manager of 84th and Center Street Drive-In Theatre. Center Drive-In Theatre Company is one of the defendants in this proceeding. Herman S. Gould is not.

Central States Theatre Corporation, one of the defendants to this action, is a corporation organized under the laws of Delaware [8], with its principal office and place of business in the Paramount

---

6. Despite its obvious amenability to the service of process.

7. So far as the record before the court discloses, he still is.

8. The manifest confusion with respect thereto in the complaint, and in its own answer as originally made (which was later corrected) notwithstanding.

Building, in Des Moines, Iowa. Exactly when it was incorporated does not appear, other than that it was before July 24, 1937. Its officers, at all times material herein, have been, and are, Myron Blank (also known as Myron N. Blank), its President and Treasurer, J. N. Blank, its Vice-President and Secretary, and E. R. Lehman, its Assistant Treasurer. It is, and at all times material herein has been, the owner and operator of, and the performer of services for, theatres, both of the conventional and of the drive-in types. It does not own, or as lessee operate, any theatre involved in this litigation. But it is made a party defendant hereto, along with Frank D. Rubel, admittedly one of its employees, upon the faith of allegations substantially to the effect that, at times material herein, including the date of filing this suit, it managed both 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre. And, upon the trial, it was made clear that such averment was premised in part, though not entirely, upon the contention that what was done in the matter before the court by defendant, Frank D. Rubel, was by him done, entirely or in part, as an employee of defendant, Central States Theatre Corporation. Such action on the part of Frank D. Rubel, and also the facts relevant to the issue of the alleged, but denied, management of those two theatres by Central States Theatre Corporation, are dealt with later herein.

The drive-in theatre season in the Omaha area does not extend through the entire year. It depends upon the weather. With a flexibility rooted in the judgment of the operator, the season may commence late in March or early in April, and may extend to October or into November. And it may be even longer than that.

Of the picture films and sound recordings (later herein together referred to as pictures) exhibited in the several drive-in theatres in the Omaha area, at all times herein material—and now—all or nearly all are produced and manufactured in states other than either Nebraska or Iowa, mostly, but not entirely, in California. In order that they may be exhibited in drive-in, and other, theatres in Omaha or Council Bluffs, they are shipped in interstate commerce from places beyond either Nebraska or Iowa, to the places of business in Omaha, Nebraska of the several nationwide picture distributors, each such picture being shipped to the place of business of a distributor engaged in its distribution for the purpose of exhibition. Once arrived in the places of business of such distributors, such pictures, particularly feature pictures, are customarily exhibited in one or more of the larger conventional theatres of the city of Omaha. They are then returned to the places of business of the Omaha distributors, by which they are first inspected in regard to their condition, and then shipped, sometimes in interstate commerce, sometimes as intrastate movements, to exhibiting theatres in cities outside Omaha, either in Iowa, or in Southeastern South Dakota, or in Nebraska. From the latter theatres, they are similarly shipped, at the Omaha distributors' direction, either to other exhibiting theatres in one or another of the same states, or back to the Omaha distributors. Eventually, such pictures are nearly all [9] returned to the offices of the Omaha distributors, by which they are made available for exhibition in one of the drive-in theatres, supra, in the Omaha area. Under a practice obtaining in the Omaha area at the times material herein, such exhibition in a drive-in theatre in the area was not allowed during an interval, generally defined as thirty-five days, after the exhibition of the picture in a first run theatre in the area. It was during that interval that the pictures were sent for exhibition in theatres outside of Omaha, supra. Following its exhibition in a drive-in theatre in the Omaha area, any such picture was, and is,

9. It seems certain that some pictures, on exhibition in a theatre outside Omaha, are not returned to the office of an Omaha distributor, but are rather sent directly from the point of last exhibition to some distant distributor.

returned to the office of its Omaha picture distributor. By such distributor, it was, and is, thereupon sent, usually in interstate commerce, to another place, sometimes in that distributor's territory, sometimes to another territory, for further exhibition. And, when such pictures have been so widely exhibited as to have exhausted their market for the time being, they are returned, again usually in interstate commerce, to their respective owners for storage or destruction, or possibly and ultimately for exhumation and employment in the field of television. Both in their procurement from, and return to, the Omaha distributors of pictures by them gotten for exhibition in their respective drive-in theatres, the owners of the exhibiting theatres, either by their own employees or through carriage by them specially arranged for, customarily effect the actual transportation. They both come to the distributors' offices and get, and later return to such offices, the pictures they exhibit.

In the motion picture trade pictures are not sold, but are rather leased for exhibition only, to the owners of the several exhibiting theatres. This practice obtains, and through all times material herein has obtained, in relation to the drive-in theatres in the Omaha area, including the 76th and West Dodge Drive-In Theatre, 84th and Center Drive-In Theatre, Airport Drive-In Theatre, and Council Bluffs Drive-In Theatre, as well as to the other drive-in theatres in the area. The owners of distributing theatres enter into contracts with the distributors of pictures, whereby the distributors lease the pictures and grant to the respective exhibitors licenses for their exhibition at prescribed times, upon defined terms as to rental, and in specified theatres. Such contracts are ordinarily made without reference to the physical whereabouts of the pictures at the dates of the making of the contracts, and compliance with them frequently re-

quires the transportation of the pictures in interstate commerce to the Omaha offices of the respective distributors. They customarily require the lessees to return such pictures after use to the distributors. These contracts are in writing. Whether they are initially prepared in the distributors' Omaha offices or elsewhere, they are first lodged in, or sent to such offices, and by those offices sent to the home offices of the distributors, nearly all of which are in New York City, for consideration and rejection or approval. Unless and until approved in and by such home offices, those contracts are not final or effective. When approved, such contracts, through signed copies, are returned to the Omaha distributors' offices for the delivery of copies to the leasing exhibitors.

Of such contracts, a considerable, but not exactly determinable, number require that the leasing exhibitors pay for the licenses to exhibit the pictures a prescribed percentage, said in the evidence to vary between thirty percent and fifty percent of the box office receipts from the exhibition of such pictures in the lessees' theatres.[10] The receipts to which such percentage factor is thus applied are normally the gross receipts of the theatre during the exhibition, not including receipts from concessions and refreshments, and after the deduction of the cost of any "second feature pictures."

In the city of Omaha, there is, and at all times herein involved has been, published only one daily newspaper of city-wide circulation, under the name and style of The Omaha World Herald. It has a large circulation in Omaha and throughout the Omaha area, including Council Bluffs, Iowa. Council Bluffs has, and at all times material has had, a single daily newspaper published and circulated within its boundaries, under the name of the Nonpareil. It has no considerable circulation in Omaha. The operators of drive-in theatres in the Omaha area, before and throughout 1954,

10. This is not true of all contracts. Probably the larger number of them prescribe and require the payment of a flat rental, quite irrespective of the amount of the receipts of the exhibitors from the use of the pictures.

and continuously thereafter, have employed in their advertising programs the columns of the Omaha World Herald.

 Upon the strenuously controverted question of the identification of the "management" of the 76th and West Dodge Drive-In Theatre and the Council Bluffs Drive-In Theatre, the court has undertaken fully and carefully to discern, weigh and evaluate all the pertinent evidence. It is extensive, in fact constitutes a substantial part of the entire record made in this suit. Of it much is in writing, but a considerable part is oral. It is sharply in conflict. If there be doubt on that score, it may certainly be dispelled by a recollection of the assurance with which each of the plaintiff, on the one hand, and the defendants, Central States Theatre Corporation and Frank D. Rubel, on the other, argues that the evidence inescapably, or, at the most conservative estimate, overwhelmingly, establishes its or his or their respective position.

On, and for an uncertain interval before June 5, 1948, a corporation identified as Tri-States Theatre Corporation, organized under the laws of Delaware, with offices in the Paramount Building, Des Moines, Iowa, was engaged in the motion picture theatre business. Then, and for some unestablished time thereafter, one A. H. Blank was its President.

On, and for an unestablished period before June 5, 1948, a partnership under the name of Smith Management Company, of which the partners were Phillip Smith and Richard Smith, both of Brookline, Massachusetts, had its office in Boston, Massachusetts, where it was engaged in business involving (among possible other things) "the construction, maintenance and operation of Drive-In Theatres."

On, or some time prior to, June 5, 1948, Omaha Drive-In Theatre Company was incorporated. On June 5, 1948 Phillip Smith was its president, and, then or early thereafter, Tri-States Theatre Corporation was the owner of a "stock

interest" in it. And it was about to open, and engage in the operation of, the 76th and West Dodge Drive-In Theatre.

So, on June 5, 1948, a carefully formulated contract in writing was executed, to which Omaha Drive-In Theatre Company, Smith Management Company, and Tri-States Theatre Corporation were the only parties. It involved, and in terms divided, the management features incident to the operation of that contemplated drive-in theatre. Thus, it provided [11] that, during its effective period from January 1, 1948 to December 31, 1955, Smith Management Company should:

"a. Within the budgetary limits which may from time to time be prescribed by the Company, take charge of and supervise the maintenance and operation of said theatre and any other theatres that may be operated by the Company during the term of this agreement.

"b. Within the budgetary limits and in accordance with the policies from time to time established by the Company's Board of Directors, negotiate for the purchase or license of motion picture films to be exhibited in said theatres, advertise, publicise and exploit the exhibition of such films and purchase supplies and other equipment required for the proper operations of said theatres.

"c. Deposit receipts from operations to the Company's account in duly authorized depositaries."

and that Tri-States Theatre Corporation should:

"a. Supervise and keep true and accurate books and records showing all income and expense in connection with the operation of said theatres, which books and records shall at all times be available for examination by any of the Directors of the Company or any of its duly authorized representatives.

"b. Render to the Company weekly statements showing as far as pos-

---

11. Omaha Drive-In Theatre Company, being characterized as "the Company."

sible the receipts and disbursements of said theatres, and, at such times as the Company shall reasonably direct, render statements prepared by certified public accountants employed by the Company showing in detail the receipts, expenditures and general operations of said theatres.

"c. Disburse such funds as may be required for the proper maintenance and operation of said theatres in accordance with the provisions of this agreement; and keep true and accurate deposit books and check books which shall at all times be available for examination by any of the Directors of the Company or any of the duly authorized representatives."

It also erected a comprehensive program of liaison between Smith Management Company and Tri-States Theatre Corporation, to the end that they might the more efficiently perform their respective duties under its terms. By its paragraph numbered 6, it was provided that:

"6. Smith and Tri-States may, upon such terms and for such period of time as they may see fit, agree between themselves as to a division of duties between them other than as hereinbefore provided, including the buying and booking of films to be exhibited in said theatres."

By the first two sentences of its paragraph numbered 7, it was provided that:

"As Compensation for services to be rendered by Smith and Tri-States hereunder, the Company shall pay to each of them a sum equal to two percent (2%) of the gross receipts from operations, which payments shall during the term hereof be made on Friday of each week for the week ending with the preceding Sunday. In determining gross receipts, any amounts which may be received on account of any amusement or other tax levied by any governmental authority shall first be deducted."

Thereafter, provision was made in the agreement for the reimbursement of Smith Management Company and Tri-States Theatre Corporation severally for their expenses incurred in the performance of their respective tasks, and several other operating details were accorded attention.

On December 20, 1951, by a supplemental agreement between the parties to the contract of June 5, 1948, it was declared that, prior thereto, Tri-States Theatre Corporation had "disposed of its stock interest in" Omaha Drive-In Theatre Company, and desired "to be relieved of its duties under such management contract as of January 1, 1952," and Tri-States Theatre Corporation was "relieved of its obligations to perform under the management contract referred to herein as of January 1, 1952," and Omaha Drive-In Theatre Company delegated to Smith Management Company "the duties previously performed by Tri-States under the agreement, and Smith hereby agrees to assume and take over the performance of such duties effective January 1, 1952, with the understanding that the compensation formerly paid to Tri-States will be paid to Smith for the extra duties."

While the history of the formal arrangements whereby the management and financial accounting in respect of Midway Drive-In Theatre Company were provided for is not established in this record by written instruments, or with the detail reflected in the foregoing findings touching like services for Omaha Drive-in Theatre Company, it sufficiently appears that the arrangement upon those features respecting both of those theatre operating corporations was essentially identical on and for some time before December 20, 1951, when the foregoing supplemental contract was made, and also that, as of the date last given, the entire management of the business of Midway Drive-In Theatre Company was entrusted to Smith Management Company, in like manner as was the

management of the business of Omaha Drive-In Theatre Corporation.

But the program contemplated in the agreement of December 20, 1951 proved to be of short duration. For, on March 10, 1952, Smith Management Company wrote and transmitted the following letter to the designated addressees (infra), and sent a carbon copy of it to the defendant, Central States Theatre Corporation:

"Philip Smith Operating
"Richard A. Smith Theatres
 Drive-In Theatres
 Restaurants

"Smith Management Company
"359 Boylston Street
 Boston 16, Mass.
"Telephone COpley 7–5610

 "March 10, 1952
"Des Moines Drive-In Theatre
 Company
"Omaha Drive-In Theatre Company
"Midway Drive-In Co.
"Drive-In Concessions, Inc.

"Gentlemen:

"In connection with our employment contracts with you under the terms of which we agree to render certain services for which we receive four per cent (4%) of the gross receipts from the operation of the Drive-In Theatres and concession stands at Des Moines, Council Bluffs, and Omaha, we have delegated certain duties to Central States Theatre Corp. and hereby request that you pay direct to Central States Theatre Corp., 700 Paramount Building, Des Moines, Iowa, fifty per cent of the fee payable to us under the employment contracts; this procedure to be followed until revoked by us.

"You are also to pay traveling expenses direct to Central States Theatre Corp. incurred in the performance of the duties which we have delegated to them under our employment contract with you.

"Very truly yours,
"Smith Management Company
"By /a/ Richard A. Smith
 "Richard A. Smith
"cc—Central States Theatre Corp."

Beyond question, that letter failed to define or describe in any manner the "certain duties" which it declared that its writer had "delegated * * * to Central States Theatre Corp." and for which the latter corporation was to be paid, in addition to its expenses, "fifty per cent of the fee payable" to Smith Management Company "under the employment contracts." But from oral testimony received in the trial, it is found that by those terms the parties meant to describe the functions which, under the agreement of June 5, 1948, had initially been committed to Tri-States Theatre Corporation.

Thus, with the aid of considerable oral testimony, the instruments of June 5, 1948 and December 20, 1951, and the letter of March 10, 1952, appear ostensibly to commit to defendant, Central States Theatre Corporation, from and after March 10, 1952 "until revoked by" Smith Management Company [12], the performance of the bookkeeping and accounting services originally entrusted to Tri-States Theatre Corporation, but to retain in Smith Management Company the management otherwise of the two theatres in controversy. And the defendants, Central States Theatre Corporation and Frank D. Rubel presented much oral evidence, whose import was that in all respects that division of function was consistently maintained and observed in actual practice.

Among the items of such evidence supportive of that position of defendants, Central States Theatre Corporation and Frank D. Rubel, and without attempting to identify every such item, some are now mentioned.

12. And there is no evidence of express revocation of that character by any written instrument, or by formal agreement, referable to any particular time and place.

In their testimony, Myron Blank and Frank D. Rubel declared that Frank D. Rubel alone performed and performs the active supervisory and authoritative management of each of the two theatres involved; that he did not, and does not, perform such management as a part of the duties of his acknowledged general employment by, and relationship with, Central States Theatre Corporation, but performed and performs it rather under an arrangement with Omaha Drive-In Theatre Company and Midway Drive-In Theatre Company respectively, and also with Smith Management Company; that he has received and receives his entire compensation and reimbursement of expenses for his services in the management of each of those theatres in the form of checks in his personal favor from the several corporate owners of those respective theatres; [13] that he performs his managerial duties towards those two theatres upon the basis of his own personal judgment and discretion, uncontrolled and undirected by Central States Theatre Corporation; that his reception of compensation for, and reimbursement for expenses incident to, his management of those two theatres is not unique or peculiar to such theatres, but he receives in the same way and through like channels, *mutatis mutandis,* his compensation and reimbursement of expenses incident to the management of other theatres not owned by Central States Theatre Corporation; and that payment for his services and reimbursement of his expenses in connection with his managerial work for theatres owned by Central States Theatre Corporation are made to him by Central States Theatre Corporation. That Mr. Rubel does receive from the corporate owner of each of the two theatres under consideration checks in payment for his services and expenses connected with the management of such theatres respectively is found to be true. But the court considers that undoubted fact to be only an evidentiary fact supportive of the view that for each of such theatres his managerial authority comes to him personally and directly from the corporate owner of such theatre. That method of payment may equally be, and as the court is persuaded is, a device or method whereby, to the extent of his services and expenses in behalf of each such theatre, its owner, by making payment direct to Frank D. Rubel, really compensates Central States Theatre Corporation for the work of Frank D. Rubel, and to that extent relieves Central States of the obligation to pay Frank D. Rubel his salary.

But there is evidence in considerable volume and, in the court's estimation, of persuasive significance, leading to the conclusion that in practical reality, Central States Theatre Corporation actively participated, and participates, in the management of each of the two theatres, and that Frank D. Rubel's services of that character are referable to his employment by Central States Theatre Corporation.

Thus, incident to an investigation by the Department of Justice of the United States, and by way of an "explanatory memorandum" with reference to data and information called for in subpoena served on Central States Theatre Corporation, Mr. E. R. Lehman, who then was not only a Director and Treasurer of both Omaha Drive-In Theatre Company and Midway Drive-In Theatre Company, but also Assistant Treasurer, and the person directly in charge of the accounts and financial records of Central States Theatre Corporation, executed and caused to be delivered to the attorney for the United States, in charge of the presentation of evidence to a grand jury, an affidavit sworn to on January 31, 1956. In the initial factual statement of that affidavit, he stated:

"Central States Theatre Corporation, the company named in the subpoena under which the statements herein contained are furnished, has no ownership in any companies operating Drive-In Theatres in the Omaha area. However, through an agreement with Smith Management

13. And representative checks evidencing such payments are in evidence in the case.

Company of Boston, Massachusetts, which company holds management contracts with Midway Drive-In Co. and Omaha Drive-In Theatre Company, operators of Drive-In Theatres in Pottawattamie County, Iowa, and Douglas County, Nebraska respectively, Central States Theatre Corporation has been employed to manage the corporations' respective theatres and maintain all corporate books and records.

\* \* \* \* \*

"It is by virtue of its management relationship with Omaha Drive-In Theatre Company and Midway Drive-In Co. that we are able to and do submit to you the following data and information.

\* \* \* \* \*

"Mr. Frank D. Rubel who is presenting this memorandum to the court occupies the position of District Manager and film buyer for all of the Drive-In Theatres which are operated by Central States Theatre Corporation and associated companies, including the Drive-Ins operated by Midway Drive-In Company and the Omaha Drive-In Theatre Company. In addition, Mr. Rubel has his own personal theatre interests.

"In the calendar years 1954 and 1955 he received income from the following companies:

Midway Drive-In Theatre Company
Des Moines Drive-In Theatre Company
Cedar Rapids Drive-In Co.
Central States Theatre Corporation
Strand Amusement Company
Omaha Drive-In Theatre Company
Lee Theatre Company

"Mr. Rubel's duties include the leasing of all films for the Drive-In Theatres, hiring of managerial help, purchasing and leasing of ground for any additional Drive-Ins and supervisory management of the theatre, but does not include the care of any

records or books or tax forms or corporate records."

It is clear that by such affidavit he attributed the ultimate effective managerial control over both of the theatres under consideration to defendant, Central States Theatre Corporation.

However, by an affidavit, sworn to on July 24, 1956 and filed herein on April 22, 1957 (filing 42), Mr. Lehman undertook to repudiate, or to minimize the significance of, nearly all of the material quoted above from his earlier affidavit, and in general to support the position touching the relations of Central States Theatre Corporation and Frank D. Rubel towards the management of the two Drive-In Theatres involved, which is contended for by Central States Theatre Corporation and Frank D. Rubel. And in that later affidavit, Mr. Lehman tried to explain his language in the earlier affidavit by a want of comprehension on his part of the precise purpose towards which the earlier affidavit was oriented. Both of the affidavits are before the court, as is also Mr. Lehman's testimony in the court's presence, which dealt only briefly with the disparity between the two affidavits. The court has considered in this relation also the evidence, including, so far as they were produced, the written instruments dealing with the management of the two theatres, and the operations of Central States Theatre Corporation and Frank D. Rubel. It is not impossible that it may be said of the quoted portion of the affidavit of January 31, 1956 that it illustrates the truth that:

"Many a shaft at random sent Hits mark the archer never meant."

Yet, the question really before the court in respect of it is whether the quoted statements fairly reflect the facts. The court is of the opinion, based upon the entire evidence, that such question must be answered affirmatively. An objective declaration of fact is not to be rejected on the ground alone that its maker did not know precisely why the information was sought. On the contrary, an ac-

knowledged awareness of such reason frequently lies at the root of evasion, imprecision, or even downright falsehood in answering. Besides, Mr. Lehman simply could not have been completely ignorant of the use to which the earlier affidavit—and more particularly the information it contained—might be put. The affidavit was knowingly tendered to the attorney for the United States Department of Justice, then engaged or about to be engaged in the presentation of evidence to a Federal Grand Jury. The inquiry of the Grand Jury was clearly aimed at operations of the men and corporations identified with the motion picture industry, who were named in the affidavit. The likelihood was great that it had to do with the Sherman Act. And Mr. Lehman was and is a man of long experience, as well as of close acquaintance with the men and corporations about whom and which he spoke in his affidavit, and their manifestly complex business operations. The court credits the earlier of his affidavits. Doing which, it considers both of the affidavits, Mr. Lehman's bearing as a witness, and the other evidence respecting the relationship between Central States Theatre Corporation and Frank D. Rubel, and the manner of their dealings, both generally and in connection with the two theatres directly under consideration. Reference will now be made as briefly as possible to that other evidence.

That Frank D. Rubel was and is primarily an employee of Central States Theatre Corporation is not questioned. He worked and works, by way of headquarters, in office space in the offices of that corporation. His duties were and are wholly connected with the motion picture industry, which was and is the business in which Central States Theatre Corporation has been engaged throughout its existence. His classification of his own duties through his employment is as a buyer or booker of films, and the supervisor of some theatres. In that classification, he is essentially correct. Incidentally, he also had, in 1955 and thereafter, some interests of his own

in theatre operations, the identification of which has not been shown. As the buyer, or more exactly the procurer of leases, of films, he has negotiated for, and procured leases of, films for theatres that were and are variously either wholly owned, or partly owned, or managed, by Central States Theatre Corporation. Among the theatres for whose use he has procured the leases of films were, and are, 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre (which is found, as yet, without the attribution of that activity to his employment by Central States Theatre Corporation). In all his work, he used and uses the offices of Central States Theatre Corporation, and its telephone facilities, the services of its secretarial staff, and its printed stationery, and its office supplies. Working thus, he has regularly corresponded by mail, on Central States Theatre Corporation stationery, with agencies of the distributors of pictures respecting the leasing of pictures for exhibition at various theatres, including 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre. Also, for both of those theatres, he has booked and books under written contracts pictures to be exhibited, and in many such bookings and contracts, has identified Central States Theatre Corporation as the "exhibitor" by the use of that term, and also as the lessee executing the contract. In such execution, each of the contracts bore a stamped copy of the name "Central States Theatre Corp.", which was followed by the printed word, "by," and the handwritten signature of Frank D. Rubel. Many contracts were executed in that manner in 1954. The evidence, however, also includes several contracts or proposed contracts for the leasing of pictures for exhibition, some in 76th and West Dodge Drive-In Theatre, some in Council Bluffs Drive-In Theatre, in each of which the exhibitor and maker of the contract is identified as "Omaha Drive-In Theatre Co." or as "Midway Drive-In Co.," as the case may be. Those latter contracts were executed in 1955,

none earlier than March 4, 1955, most of them substantially later than that.

But Mr. Rubel was not the only employee of Central States Theatre Corporation who procured leases of pictures for exhibition in each of the two theatres, whose management is in controversy. Other persons, employed by it as "film bookers" made such bookings, including Larry E. Day and Neil B. Adair. In both 1954 and 1955, Mr. Day, using Central States Theatre Corporation stationery, conducted correspondence with the Omaha office of Republic Pictures' distributor respecting such bookings for 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre. And during the same interval, as a booker for Central States Theatre Corporation, and on its identifying printed forms, he repeatedly sought booking confirmations for films for exhibitions in many theatres in Nebraska, and including 76th and West Dodge Drive-In Theatre, and for Council Bluffs Drive-In Theatre, in which the identity of the exhibiting theatres, and the names of the films involved, and the dates of exhibition were disclosed. And, on October 21, 1954, "Neil B. Adair Central States Theatre Corp.," by telegram to the Omaha office of Republic Pictures, sought the enlargement of exhibition time for a film to be exhibited in Council Bluffs Drive-In Theatre.

In the processing of its booking operations in the Omaha area, Central States Theatre Corporation, with substantial regularity, paid with its own checks the license fees for pictures by it booked for exhibition in various Nebraska theatres, including 76th and West Dodge Drive-In Theatre, and in Council Bluffs Drive-In Theatre. In making such payments, it sometimes made payment on account of a single theatre, but more regularly paid for the use of films in several theatres through a single check. The other Nebraska theatres included houses in Hastings, Holdrege, York, Columbus, Kearney, Norfolk, Albion and Fremont. Only the one Iowa theatre was involved in the payments now recalled. In making these payments, Central States Theatre Corporation prepared, or procured, a statement or voucher identifying the several pictures involved, and the information for each of them upon its exhibition dates, and theatre and town or city of its location, and the rental fee. It thereupon paid for all rentals disclosed on the voucher by its single check in favor of the distributor providing such pictures. And promptly, thereupon, it billed each theatre for, and from it collected, the rentals on pictures thus paid for, which had been exhibited in such theatre. The rentals for pictures exhibited in 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre were paid in the first instance by Central States Theatre Corporation, and by it later collected from the corporate operator of each theatre in that way.

Central States Theatre Corporation upon this submission argues that all of its activities in connection with the booking and scheduling of pictures for 76th and West Dodge Drive-In Theatre and Council Bluffs Drive-In Theatre were merely steps in the way of obtaining verification of film schedules, incident to its disbursing, bookkeeping and accounting operations for those theatres. That those activities facilitated its financial operations and record keeping for the two theatres is certainly true. But they went much farther. They assured the provision of pictures, the aggregate admission prices for whose exhibition constituted the major part of the income of the theatres, and which even attracted the customers whose purchase of refreshments made up much of the rest of that income. They were a vital and essential part, probably the most vital and essential, of the service rendered by any one in the management of both theatres. And Central States Theatre Corporation performed that service. It performed that service no less certainly because the execution of its details, and the exercise of discretion in respect of it, were committed principally to its employee Frank D. Rubel. But, as has already been found, other employees of Central States

Theatre Corporation than Frank D. Rubel also participated in the booking operations for those two theatres as a feature of their management.

In its operation of 76th and West Dodge Drive-In Theatre, Omaha Drive-In Theatre Company, through Bernard Dudgeon, its local manager, had on hand a supply of Central States Theatre Corporation stationery. How widely and generally such stationery was actually used may not be found with certainty. But it was employed for the purpose, among others, of writing and transmitting "inter office communications" between Omaha Drive-In Theatre Company and Mr. Dudgeon on the one hand, and on the other Mr. Rubel in his office in the quarters of Central States Theatre Corporation.

That Central States Theatre Corporation has not had a license to do business in Nebraska, and now has no such license is true and is found by the court. But the court, upon the basis of all of the evidence, further finds that through 1954 and 1955, and thereafter until the time of trial, that corporation, in the way of its managerial services to Omaha Drive-In Theatre, actually was transacting business within the state of Nebraska, which is coterminous with the District of Nebraska. And the court further finds that the participation by Frank D. Rubel in the meeting of February 4, 1955 (next hereinafter considered), and in the events which occurred thereafter incident to that meeting, was also the act of Central States Theatre Corporation, and an aspect of its transaction of business in Nebraska.

On an inexactly identified date late in January, 1955, Frank D. Rubel was in Omaha. While there, he called on J. Robert Hoff at the latter's office at 1712 Jackson Street, Omaha. In the course of that conversation, Mr. Hoff said to Mr. Rubel that he had recently theretofore observed in another city a method of advertising used by drive-in theatres which he considered probably to be effective and economical. And he explained it as involving the joinder by the operators of all drive-in theatres in a community in the purchase of group newspaper advertising space in substantial size, and the insertion into that space of advertising by all of them. The advertising thus inserted in each such publication was of two kinds, first, a generalized recommendation of drive-in theatres as such, and, secondly, individualized publicity whereby each exhibitor participating in the project offered support of a particular program to be shown by it. Mr. Hoff professed to see opportunity in that type of advertising, first for the attraction of reader interest by means of the consolidation of drive-in advertisement instead of scattering individual advertisements through the paper, and secondly, for economy through an arrangement whereby all participating advertisers would share the cost of the single generalized recommendation, and the owner of each theatre would pay such additional amount as should be charged on account of the special publicity for its own program. Some general discussion of other problems of the operators of drive-in-theatres in the area also ensued between Messrs. Rubel and Hoff; and the interview closed with an inexact understanding between them that the operators of drive-in-theatres in the area ought shortly to meet and discuss their mutual problems, and, without any resolution upon a date, a broad agreement that they would try to bring about a conference of that nature during Mr. Rubel's next trip to Omaha. In connection with the possibility of such a meeting, Mr. Rubel suggested that when he came to Omaha he usually lodged at the Blackstone Hotel, and that it might be a convenient place for such a meeting. That conversation occurred only a few weeks or days before the time when drive-in theatres in the Omaha area would open their season for the year 1955.

Mr. Rubel was next in Omaha on February 4, 1955. On that day, at his suggestion, a meeting was had between four men active in the operation and management of certain of the drive-in theatres in the Omaha area. The meeting was

held around a luncheon table in a large public dining room on the ground floor in the Blackstone Hotel. It lasted for about two hours, commencing at or shortly after noon. Before the meeting information had been given by, or at the direction of, Frank D. Rubel to Messrs. Bernard Dudgeon, J. Robert Hoff, Herman S. Gould and Solomon John Francis that it would be held, and that they were invited to attend. Their respective positions with the operators of drive-in theatres in the Omaha area have already been noted. An effort had also been made to communicate with Ralph Blank, the president, and William Miskell, the Vice President, of Benson Drive-In Corporation, operator of the Sky View Drive-In Theatre, of which Ralph Blank was manager, and to advise them of, and invite them to, the meeting. But they were not reached, and on February 4, 1955 were both in New York City. Nor did Solomon John Francis, in behalf of the Golden Spike Drive-In Theatre, attend the meeting. It was attended by Bernard Dudgeon, the local manager of Omaha Drive-In Theatre Company, operator of 76th and West Dodge Drive-in Theatre, J. Robert Hoff, President of Midwest Drive-In Theatre Company, operator of Airport Drive-In Theatre, Herman S. Gould, Secretary-Treasurer and Managing officer of Center Drive-In Theatre Company, operator of 84th and Center Drive-In Theatre, and Frank D. Rubel, supervising manager of 76th and West Dodge Drive-In Theatre, and Council Bluffs Drive-In Theatre, and employee, in that behalf, of Central States Theatre Corporation. During the course of the meeting, on the mention by one or more of the participants that Solomon John Francis was not present, J. Robert Hoff left the table briefly, and communicated by telephone with Mr. Francis, who advised Mr. Hoff that he had been detained but would try to reach the meeting while it was still in progress. He never arrived. And another participant withdrew temporarily and tried unsuccessfully to reach by telephone either Ralph Blank, the President or William Miskell, Vice President, of Benson Drive-In Theatre Corporation, operator of Sky View Drive-In Theatre, both of whom were in New York City.

The four participants in the meeting ate lunch, and during the meal discussed the problems of their common business, especially in view of the imminent opening of the Drive-In Theatre season in the Omaha area. Their discussion dealt with the entire condition locally of the business, but it was concerned particularly with the following subjects: (a) wages of snack bar employees; (b) wages of ramp boys; (c) a program for advertising in the Omaha World Herald, with special reference to group advertising; (d) a minimum admission charge for shows, and as an incident thereto the limitation in number of special occasions on which reduced prices would be granted; (e) refreshment prices; and (f) the management of expiration of labor contracts looking to possible group bargaining with employees.[14]

During the meeting, the men present discussed and disclosed, in connection with each of those subjects, the practice in respect of it which had obtained in their respective theatres during the 1954 season. No one really presided over the meeting, although Frank D. Rubel took a leading part in it. His experience and personality substantially fitted him for that course. The conversation was discursive, not closely channeled or formalized by the use of motions or votes. Nevertheless, an effort was made to assess the opinions on the different questions of those who were present. No minutes or records of the discussion were made or kept by any participant.

In the course of the discussion, the men present concurred in the opinion that, with a special but inexact tolerance

14. Let it be understood that the court does not declare or intimate that the subjects were discussed in that sequence. They almost certainly were not. And it is quite probable that the subject first mentioned at the meeting was that of newspaper advertising.

towards Golden Spike Drive-In Theatre, in respect of snack bar employees, a fair and reasonable opening wage for a work week of about thirty hours would be $16 per week, with a possible increase of $2 per week after four weeks of service, and that a fair and reasonable wage for ramp boys would be $15 to $16 per week.

The discussion respecting newspaper advertising was directed principally, and so far as the evidence shows entirely, towards advertising in the Omaha World Herald. Upon that point, for example, Council Bluffs Drive-In Theatre had and has a special problem in that, as a matter of reasonable publicity, it had and has to advertise in two daily newspapers, both the Omaha World Herald, on account of its large Council Bluffs circulation, and the Nonpareil, which is its "local paper." Upon this subject, and with particular relation to the Omaha World Herald, Mr. Hoff's earlier suggestion to Mr. Rubel, supra, was advanced and discussed. And the participants in the meeting agreed that they would undertake to join in a group advertisement of drive-in theatres containing both publicity advancing the claims of such theatres generally, and also individual advertising of each exhibitor concerning its own programs, with the understanding that all cooperating theatres would share ratably in paying the charge for the generalized part of the advertisement, and each theatre would pay the charge for its individual advertising, with the understanding that the total expense of such advertisement to each threatre should not exceed $120 per week. And it was agreed that advertising by an individual theatre of first run pictures or stage attractions should be left entirely to the choice, both in respect of the manner of offering the publicity and on the score of cost, of the exhibiting theatre.

In the matter of the price of admission to the drive-in theatres, it was agreed that a fair minimum price for regular individual admissions would be 65 cents, with the exception of what were called "Buck Nights," and no exhibitor should conduct a "Buck Night" more frequently than once a week until after September 1. And the men present agreed that their respective theatres would follow that program respecting admission prices. Actually, the 65 cents minimum regular admission price had been their practice during the 1954 season, with occasional exceptions at individual theatres for particular programs.

The reference to "Buck Night" prompts an explanatory finding. It is only one of several supposedly crowd attracting devices resorted to in the drive-in theatre business, and among most of the Omaha drive-in theatres. Briefly identified, they included and include:

Buck Night. A night on which a single fee of one dollar is charged for a car and all of its occupants, irrespective of their number;

First Nighters. A practice whereunder, by use of an identifying sticker, the driver and the car are admitted free, but all other occupants of the car pay regular admission prices;

Driver Passes. A device whereby an Omaha chain grocery gives without charge to its individual customers passes to a drive-in theatre for the admission of the customer holding the pass, but only as to a car driver. The passes are provided by the theatre to the chain store, and in return the chain store provides advertising for the theatre through signs in its store and in television shows;

60 Cent Early Bird Adult. An arrangement whereby during an interval of about thirty minutes before the opening of a show, adults are admitted for sixty cents; and

Yellow Rose Show. A device of admitting without charge to a show whose title mentions a particular color, all persons in cars, or ladies wearing dresses of that color. E. g. the show "The Yellow Rose of Texas."

The evidence does not disclose that the discussion of the meeting dealt with any of those devices, except Buck Night. That is probably true, because it was the device resorted to from time to time by

all, or nearly all, of the drive-in theatres in the area.

Concerning refreshment prices, it was suggested that a fair schedule for such prices would be:

| | |
|---|---|
| Popcorn | 15 cents |
| Drinks | 7 oz. 10 cents |
| | 18 oz. 25 cents |
| | Larger, 35 cents or more |
| | Hot Dogs, 20 cents |
| | Hamburger, 25 cents |

But no agreement or undertaking was made that any such price schedule would by any operator be put into effect. However, it was generally agreed that the refreshment price schedule theretofore observed by each of the represented theatres was essentially conformable to that schedule, with the reservation of the fact that their respective practices in the quantities of items of refreshment individually sold varied considerably, and that their quoted prices varied accordingly.

After discussion of the labor contract experiences of the represented theatres, it was agreed that they had an economic interest in having all labor contracts in the enterprise within the Omaha area expire at a common date, and that, with a view to bringing about such a practice, no new labor contract should be agreed to for application to any represented theatre which should extend beyond the end of the 1955 drive-in theatre season.

During the conference, also, one of the participants other than Frank D. Rubel advanced the suggestion that it would be in order to erect a program whereby a penalty might be imposed on any operator who should thereafter fail to conform to the arrangements that had been discussed and agreed upon. And a device was proposed whereby a penalty of $100 might be imposed for such a "violation." But no agreement upon that subject was reached. Not all of those present treated the proposal seriously. Besides, it was recognized that any practical device for the enforcement of such a penalty would probably be indefensibly complex.

But, without formal motions, votes or record, the men attending the meeting did agree that (a) to the extent only that they had reached agreement, supra, respecting wages to snack bar employees, and ramp boys, newspaper advertising in the Omaha World Herald, minimum admission prices, with limitation upon the resort to "Buck Nights," and the achievement of a common expiration date of labor contracts,[15] and (b) subject to verification of the details of the points on which they had agreed, their respective theatres would, in their 1955 season then about to open, follow the program thus agreed upon. It is here repeated that no agreement was reached governing the prices that would be charged for refreshments. While no arrangement was made for an early further meeting, the court considers and finds, from collateral evidence touching the subject, that the participants in the meeting left it with the impression that they would have such a further meeting at which it was desired that Mr. Ralph Blank or Mr. William Miskell and Mr. Solomon John Francis might be present. For the collaboration in the contemplated program of Sky View Drive-In Theatre and Golden Spike Drive-In Theatre was desired, and as the court believes and finds, was to be sought actively.

While no arrangement was made at the meeting that any one of the participants should prepare and circulate a summary of its action, Frank D. Rubel actually and promptly did that. February 4, 1955 fell on a Friday. And it found Mr. Rubel in Omaha, some one hundred fifty miles distant from Des Moines, and his normal clerical assistance. The next regular business day was Monday, February 7, 1955.

On February 7, 1955, in his Des Moines office, Frank D. Rubel prepared and had typed in several copies the following memorandum, copies of which, unsigned,

15. Which, in these theatres, have application largely to projection machine operators.

he sent with signed covering letters to the other participants in the meeting:

"The following items in mutual interest were agreed upon—

"1. All snack bar employees are to receive $16.00 weekly to start with (approximately 30 hours per week.) and will be eligible for a $2.00 weekly additional after having worked four weeks. It is understood that the Golden Spike could pay a dollar or two weekly additional for car allowance.

"2. Ramp boys are to receive $15 to $16 weekly.

"3. Re: Omaha Newspaper—all four theatres agree that they will advertise in a daily column but that the total advertising expense for each theatre is not to be in excess of $120.00 per week, each week to begin on a Sunday. Note: Any common heading or border space would be divided and paid for pro rata by the cooperating theatres and the newspaper would be instructed to bill this accordingly.

"Further note that the space could be taken by the individual theatre in any way they see fit, just so the total amount does not exceed the $120.00 maximum per week. On any first run or stage attraction the theatre can spend whatever amount it deems desirable.

"4. No theatre is to charge less than 65¢ regular admission except on Buck Nights from opening to September 1.

"5. No more than one Buck Night weekly will be used by any theatre from opening until September 1.

"6. The following snack bar prices were suggested:

Popcorn – 15¢
Drinks – 7 oz. – 10¢
 18 oz. – 25¢
 Larger – 35¢ or more
Hot Dog – 20¢
Hamburger – 25¢

"7. No labor contract shall be agreed to by any theatre to extend beyond the 1955 Drive-In Season."

His covering letter to Herman Gould follows:

"Central States Theater Corporation
 "Myron N. Blank, President
 "Executive Offices
 "Paramount Building
 "Des Moines, Iowa
 "Tel. 3–5287
 "February 7, 1955
"Mr. Herman Gould
"Center Drive-In
"54th and Center
"Omaha, Nebraska

"Dear Herman:

"Attached hereto is copy of memo outlining items which we discussed at luncheon in Omaha. It is my understanding that you will discuss the attached with Sol Francis and if they agree to these items, we will be guided accordingly.

"Please let me hear from you after you have talked to Sol.

"Kindest regards.
 "Very cordially,
 "/s/ Frank
 "Frank D. Rubel
"FDR:ck
"cc: Bernard Dudgeon"

A carbon copy of that letter was sent to Bernard Dudgeon. And Messrs. Dudgeon and Gould, or at least Mr. Gould, shortly after its receipt took the covering letter and the copy of memorandum enclosed with it to Solomon John Francis at his office in Omaha.

Mr. Rubel's covering letter to J. Robert Hoff follows:

"Central States Theatre Corp.
 "Paramount Building
 "Des Moines 9, Iowa
"Mr. Bob Hoff
"Ballantyne Company
"1712 Jackson
"Omaha, Nebraska
"Dear Bob:

"Enclosed herewith is copy of memo of our discussions in Omaha

last Friday. I am also sending a copy of the attached to the others who attended the meeting. If all four Drive-Ins who attended the meeting agree to the attached, it will go into effect. If they don't agree, of course, it will not.

"I did not put anything in the memo about any $100 forfeit by any theatre that did not live up to the agreement on newspaper space as this is quite involved and would have to be put into escrow in the bank and would require some further thought. If you want it and want to work it out, I am perfectly agreeable to it.

"Will see you in Saint Louis.
"Very cordially,
"/s/ F.D.R.
"Frank D. Rubel
FDR:ck
"cc: Bob Huntling
"c/o Airport Drive-In Theatre
"Carter Lake, Iowa"

To Bernard Dudgeon, besides the carbon copy of the foregoing covering letter to Herman Gould, Mr. Rubel sent a covering letter, of which he also sent a carbon copy to Ted Belles, then the local manager of Council Bluffs Drive-In Theatre, and along with each copy of that letter he enclosed a copy of the memorandum to which the covering letter referred. The covering letter thus sent to Messrs. Dudgeon and Belles was in this language:

"Frank D. Rubel Des Moines
"February 7, 1955
"Bernard Dudgeon
"Omaha Drive-In

"Please note the attached copy of memo of various items which were discussed at our luncheon meeting last Friday in Omaha. If this plan is adopted and agreed to by all parties, of course we will follow it to the letter.

"Unless you hear from me to the contrary, please plan to conform to the attached memo.

"Kindly acknowledge receipt of this letter.
"FDR:ck Frank D. Rubel
"cc: Ted Belles"

Also, late in the afternoon on February 7, 1955, Frank D. Rubel, by long distance telephone, called Ralph Blank, whom he reached at the latter's home in Omaha, and discussed with him the meeting which had been held on February 4, 1955. In the course of that discussion, he told Ralph Blank the substance of the discussion at the meeting, and Ralph Blank made notes in ink on an unused mailing envelope upon that telephone conversation. Without copying those notes, the court observes and finds that both in sequence and in verbiage, they follow in essence the language of the memorandum which Mr. Rubel prepared on February 7, 1955. The fidelity of Ralph Blank's notes to the memorandum is sufficiently complete that it would excite suspicion touching its preparation by Mr. Blank during the telephone conversation, but for one circumstance. That circumstance is that Mr. Rubel had prepared the memorandum on the very day the conversation occurred, and almost inevitably conducted the conversation with a copy of the memorandum before him.

And on February 9, 1955, Ralph Blank received in his mail a copy of the memorandum prepared by Frank D. Rubel on February 7, 1955.[16] Ralph Blank's han-

16. At this point, the court observes an incongruity in Ralph Blank's testimony and record. He made a note in ink on a "Central States Theatre Corp." envelope to the effect "the enclosed" (identified as the copy of the memorandum) was received in that envelope on February 9, 1955. But the envelope bears a postal meter stamp dated at "Des Moines, Iowa" on "Feb. 8 '54," thus exactly a year before any possible mailing date. This feature admittedly excites some suspicion of the correctness of Ralph Blank's notations. But it is hardly regarded as persuasive. Admittedly, the memorandum was sent to and reached him.

dling of that memorandum is mentioned early hereafter.

The memorandum of which duplicates were thus made and circulated, and the covering letters with which certain of the copies of it were transmitted, have been copied herein for the reason that they are in evidence, and to the court appear to have persuasive probative significance. The memorandum, prepared so early after the meeting, is convincing evidence of what principally transpired at the conference. It was written by an active participant in the meeting, and transmitted to the others who were present (as also to Messrs. Francis and Ralph Blank, whose cooperation was desired). And it fairly reflects in respect of several—not all—of the features of its subject matter an "agreement," not merely a "suggestion." And the covering letters serve to support and confirm the view that the participants in the meeting resolved upon action in execution of the agreement. Thus to J. Robert Hoff, Frank D. Rubel said, *inter alia,*

> "If all four Drive-Ins who attended the meeting agree to the attached, it will go into effect. If they don't agree, of course, it will not."

And to Dudgeon and Belles, over the operations of each of whom he held directory authority, he wrote:

> "If this plan is adopted and agreed to by all parties, of course we will follow it to the letter. Unless you hear from me to the contrary, please conform to the attached memo."

From all of the evidence, the court finds that, of the men who attended the February 4, 1955 meeting, none signified any dissent from the reflection of their understandings as contained in Frank D. Rubel's memorandum prepared on February 7, 1955. It is true that as witnesses upon the trial, each of them denied that any real agreement was reached upon any of the points raised beyond an understanding that the operating ideas reflected in the memorandum were fair and reasonable. But the court is convinced that in that position they are inaccurate and unrealistic in the light of the context of the meeting, and the entire evidence regarding it.

The court, therefore, considers and finds that the agreement of the parties to the meeting, in behalf of their respective principals and theatres, was that, to the extent that they agreed upon wages of snack bar employees and ramp boys, Omaha World Herald newspaper advertising, admission prices with restrictions on Buck Nights, and the time for the expiration of future labor contracts, vide supra, they would follow those undertakings in their operations during 1955. And, although the men present are considered to deny what is now said, they further understood and agreed that an effort would be made to secure the concurrence in their course by Ralph Blank, in behalf of Sky View Drive-In Theatre, and Solomon John Francis, in behalf of Golden Spike Drive-In Theatre. Despite the denials by those present of that phase of the understanding, the totality of the evidence points clearly to its existence. And, among the items of such evidence, are the efforts during the meeting to reach Ralph Blank and William Miskell and Solomon John Francis, and the direct approaches very early after the meeting to both Ralph Blank and Solomon John Francis.

There is, of course, a possibility that it was further agreed at the meeting that if Ralph Blank and Solomon John Francis, or either of them, refused or failed to adhere to, and conform with the agreement made at the meeting, such agreement would not be regarded as effective at all, even among the men who attended the meeting, and upon their respective theatres. An implication to that effect may be perceived in some of the evidence, but only vaguely and unconvincingly. The very men who may be regarded as having the ability and the interest to support such a further agreement are in no position to do so, since they deny that any real agreement at all was made. Some instruction on this subject might have been derived from the covering letter

wherewith Frank D. Rubel transmitted the copy of his memorandum of February 7, 1955 to Ralph Blank. As a witness, Ralph Blank declared that there was no such covering letter. But the court is convinced that that declaration is untrue. Anyhow, no such letter is in evidence.

Solomon John Francis, for Golden Spike Drive-In Theatre, did not assent in any manner to the program outlined in the memorandum of Frank D. Rubel. Neither did he actively reject it. Actually, he evaded the expression of a decision upon it.

However, Ralph Blank, for Sky View Drive-In Theatre, not only did not assent to, but took affirmative action against, the outlined program. It is here mentioned and found that Ralph Blank and Myron Blank are first cousins, and that in certain of Ralph Blank's theatre operations (evidently not including Sky View Drive-In Theatre) Myron Blank is beneficially interested, either in his sole behalf, or for himself and others associated with him, to the extent of substantially fifty percent. Nevertheless, after receiving the memorandum prepared by Frank D. Rubel, Ralph Blank took it to Mr. Paul F. Good, one of his attorneys, who, under date of July 8, 1955 prepared and, for his firm, supra, transmitted to the Assistant Attorney General of the United States, then in charge of the Antitrust Division, a single-spaced three-page letter complaining about the competitive practices in relation to Sky View Drive-In Theatre, not only of the four theatres represented by the defendants hereto, but also of Golden Spike Drive-In Theatre, in which Solomon John Francis was and is interested. The Department of Justice was thus activated. Shortly a Grand Jury investigation was set on foot. And this litigation was started. Exactly how early the parties defendant in this case became aware of their pursuit by the Department of Justice may not be determined. But from silence, if nothing else, they must have been and were aware early after February 7, 1955 that Messrs. Francis and Ralph Blank were not making common cause with them.

Each of the 76th and West Dodge Drive-In Theatre, the 84th and Center Drive-In Theatre, the Airport Drive-In Theatre and Council Bluffs Drive-In Theatre opened its 1955 season as scheduled, and operated through the season. In their operations after such opening, they maintained a minimum admission price of sixty-five cents each for regular admission of an adult, except that at the extreme end of the season some of them had a lower general admission price than sixty-five cents. Throughout the entire season, for particular pictures, admission prices somewhat higher than sixty-five cents were charged; and such higher prices were quite common. During the 1955 season, each such theatre occasionally, but how frequently may not be found with assurance, resorted to the "Buck Night," or some other patron attracting price reduction device. However, none of the operators of any of those four theatres erected its admission price structure on the basis of the engagement entered into at the meeting of February 4, 1955. In reality, each operator pursued essentially the same price policy it followed through 1954. And what has just been said concerning the season of 1955 has essentially identical application to each subsequent season.

Since February 4, 1955 there has been no group advertising in the Omaha World Herald—or any other newspaper —in behalf of the four theatres mentioned in the last preceding paragraph, or any of them. Nor have they, or any of them, observed or attempted to observe, any maximum prescription in reference to weekly advertising expenditures. The provisions reflected in Frank D. Rubel's memorandum in relation to advertising simply have not been observed. And no attempt has been made by or in behalf of any operator of one of those theatres to observe them, or any of them.

The evidence does not warrant or support an informed finding either as to the wages paid by the operators of 76th and

West Dodge Drive-In Theatre, the 84th and Center Drive-In Theatre, the Airport Drive-In Theatre, and Council Bluffs Drive-In Theatre, or any of them, in the 1955 season, or thereafter, to snack bar employees, or ramp boys, or as to their respective available menus and unit prices for refreshments. There is some evidence in the record upon both of those points, but certainly not enough to establish a practice upon either of them in or at any theatre.

Finally, it is not shown that the labor contracts of any of the theatres have been altered or remade, or otherwise affected by, or in consequence of, the engagements at the February 4, 1955 meeting. Nor is the status of such contracts, current as of the date of trial, intelligibly established.

Actually, the several understandings, arrived at in the meeting of February 4, 1955, were never carried into practical effect. Early after the meeting, almost certainly by the opening of the 1955 drive-in theatre season, the evasiveness of Mr. Francis and the silence of Ralph Blank indicated beyond reasonable question that full adherence by the drive-in theatre operators of the Omaha area to the program outlined in the meeting, and reflected in Frank D. Rubel's memorandum of February 7, 1955, was not, and would not be, obtainable. By or shortly after the middle of 1955, the imminence, if not the actual pendency, of a Department of Justice antitrust act investigation certainly was brought home to the operators of the four theatres represented at the February 4, 1955 meeting. Early in January, 1956, the Grand Jury inquiry was under way. Before the opening of the 1955 drive-in theatre season, there was neither time nor occasion for the initiation in its several details of the practical operation of the agreed program. And very early after the opening of the season events, supra, warned the participants in the meeting that its operation would be quite improvident. It was not, therefore, put into practical operation. And that finding is not impaired by the circumstance that the admission price policy followed in 1955, and thereafter, by the four drive-in theatres involved, conformed essentially to the agreement of February 4, 1955 upon that feature. It conformed also to the practice respecting admission prices which those theatres had respectively observed through 1954. Even in the matter of admission prices, they took no action by which essential change was brought about.

The court does not declare or find that, after the meeting of February 4, 1955, the participants in that meeting entered into any supplemental agreement formally abandoning any practical introduction of the engagements they made at the meeting, supra. On the contrary, by their failure, through inaction, to reassemble and reaffirm their adherence to the program agreed upon, and thus to get it under way, they suffered it to remain inoperative. In the event, it proved to be abortive.

The jurisdiction of this court over the subject matter of this proceeding validly exists under Title 15 U.S.C.A. § 4. Except for a denial of the impact of the matters charged on interstate commerce —dealt with shortly herein—such jurisdiction is not seriously challenged.

It will have been observed, supra, that each of the defendants, Central States Theatre Corporation and Frank D. Rubel, challenges this court's jursdiction over its or his person and venue in the action as against it or him, and assails the validity of the service of process upon it or him, as the case may be. Those contentions are to be considered separately.

■ The corporate character of defendant, Central States Theatre Corporation has to be remembered. By Title 15 U.S.C.A. § 22, it is provided that:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the

**142**

district of which it is an inhabitant, or wherever it may be found."

Defendant, Central States Theatre Corporation, is not an inhabitant of the District of Nebraska. It is a Delaware corporation, and has its principal place of business in Des Moines, Iowa. It holds no permit to do business in Nebraska. But, as the court has found, supra, it actually transacts, and at the times material herein transacted, business in Nebraska, and it does that by virtue of its relationship to, and service for, Omaha Drive-In Theatre Corporation, in the latter's operation of the 76th and West Dodge Drive-In Theatre. Saying which, the court recognizes that Central States Theatre Corporation does not have, and has not had at any time material herein, so far as the record in this case discloses, any property, real or personal, or bank account, within Nebraska. Nor, except Frank D. Rubel, does it have, or has it had, any employee in the state. And even he comes into the state only occasionally, though with fair regularity, and as business from time to time requires. Nevertheless, through him, and to a substantial extent through others of its employees, supra, Central States Theatre Corporation, with relative constancy, participates in the management of the 76th and West Dodge Drive-In Theatre. And it was incident to that managerial service that this proceeding was brought against both Central States Theatre Corporation and Frank D. Rubel. The court, therefore, considers that, under the plain language of Title 15 U.S.C.A. § 22, the defendant, Central States Theatre Corporation, was properly made a defendant hereto.

And, once made a defendant, it was amenable under the same section of the statute to service "in the district of which it is an inhabitant." So, without purposeless consideration whether it might validly have been served with process in Nebraska,[17] it is sufficient to say that it was subject to effective service of process in the Southern District of Iowa. And it was served there.

■ The court is made aware that defendant, Central States Theatre Corporation, appears to question the validity of the service of process on it which was thus made, and that upon the ground that the copies of summons and of the complaint should have been delivered to some other person than the man to whom they were delivered, in its behalf. By Rule 4(d)(3) of the Federal Rules of Civil Procedure, 28 U.S.C.A., it is provided that:

"(d) * * *. Service shall be made as follows: * * *

"(3) upon a domestic or foreign corporation * * * by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process."

It will be noted that such rule requires only that he to whom the copy of the summons and of the complaint is delivered be an officer of the defendant corporation. It does not, as statutes sometimes do, erect a descending scale of officers with a requirement that to support the validity of service by delivery of the copy of process to one low in the scale, the availability of those higher than its recipient be negatived. The record shows that the copies of the present summons and complaint were delivered to E. R. Lehman, Assistant Treasurer of the corporation. That, as the court is persuaded, constituted valid service.

■ Finally, this may be observed in relation to the inclusion as defendants hereto of, and the service of process on, both Central States Theatre Corporation and Frank D. Rubel. In this action, each of the defendants, Midwest Drive-In Theatre Company and Center Drive-In Theatre Company, is a corporation organized and existing under the laws of Nebraska, and is both found and transacting business in the District of Ne-

17. No such service was attempted, or is involved in the case.

braska. The action, therefore, was one which might properly be brought in this district as to both venue and jurisdiction against those two defendants. And, that being true, it was proper for the plaintiff to institute the proceeding here and, upon due order by the court, to bring in, and provide for the service of process upon, other alleged co-conspirators domiciled and actually residing beyond this district. It was so held in the opinion of Judge Sanborn in United States v. Standard Oil Company, C.C.E.D.Mo., 152 F. 290, Circuit Judges Sanborn, Van De Vanter, Hook, and Adams participating, see especially pages 295, 296 and 297. In that action, many defendants, both corporate and individual, challenged both venue and the validity of process and its service. But the Circuit Court upheld both venue and the process and service, affirmed its own jurisdiction, and later, on submission of the case, went on to decree. United States v. Standard Oil Company, C.C., 173 F. 177 (the same judges participating) which, with modification which is presently immaterial, was affirmed. Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 510, 55 L.Ed. 619. In its opinion, the Supreme Court declared:

> "We are of opinion that in consequence of the presence within the district of the Waters-Pierce Oil Company, the court, under the authority of § 5 of the anti-trust act, rightly took jurisdiction over the cause, and properly ordered notice to be served upon the nonresident defendants."

The same subject had been dealt with by Judge Sanborn in his earlier opinion in the case, though with much more exhaustive analysis, supra.

█ What has already been said herein in application of Title 15 U.S.C.A. § 22, supra, is not applicable as against Frank D. Rubel. That section of the statute has pertinence only to corporations. And Frank D. Rubel is an individual. But this action under Title 15 U.S.C.A. § 4, was originally instituted against the three corporate defendants only. Several months after its institution, plaintiff in writing moved under Rules 15(a) and 21, Federal Rules of Civil Procedure, for leave to add Frank D. Rubel as an additional party defendant, and to amend its complaint accordingly. Upon notice and hearing, leave as requested was granted on January 15, 1957 (filing 30), and the amendment was filed at once. On the same day, upon separate written motion, an order of court was made and given that:

> "it appearing that the ends of justice require that the following named non-resident defendant be brought before this court:
>
> "Frank D. Rubel
> "500 Paramount Building
> "Des Moines, Iowa
>
> "It is therefore ordered that summons issue herein to. the above named defendant and that service thereof be made by the United States Marshal for the district in which said defendant resides or may be found, pursuant to Section 5 of the Act of Congress of July 2, 1890," (i. e. Title 15 U.S.C.A. § 5).

Summons was issued on January 16, 1957 for, and on January 18, 1957 at 500 Paramount Building, Des Moines, Iowa, together with copy of the amendment to complaint, was served on Frank D. Rubel. Resort was thereby had to Title 15 U.S.C.A. § 5, whose language follows:

> "Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

Since section 4 of Title 15 U.S.C.A. has to do exclusively with proceedings brought by the United States, the authority conferred by the language just quoted from Title 15 U.S.C.A. § 5, is, by

its very terms, limited to cases in which the United States is a party. With that limitation, it is an effective enlargement of the area within which a defendant, especially an individual, may be sued under Title 15 U.S.C.A. § 4. That view has been judicially supported. State of Georgia v. Pennsylvania Railroad Company, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; Greer, Mills & Co. v. Stoller, C.C. W.D.Mo., 77 F. 1; Hansen Packing Company v. Armour & Company, D.C.N.Y., 16 F.Supp. 784; and 58 C.J.S. Monopolies § 117(a)(3)(4), pp. 1166, 1167. Frank D. Rubel was, accordingly, properly brought into the action. And thus, equally with Central States Theatre Corporation, he is within the reach of the rule touching parties and service set out in United States v. Standard Oil Company, C.C.E.D.Mo., 152 F. 290, and Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

■ Notice is taken at this point of separate contentions in their briefs by Central States Theatre Corporation and Frank D. Rubel first, that no judicial finding was made "that the ends of justice require that" such parties "be brought before the court" and, secondly, that if any such finding was made, it was made without hearing upon notice. Respecting that first such contention, it is observed that, as to each of those two defendants, it is factually untrue. An order with such finding was made on April 2, 1956 (filing 4) as to Central States Theatre Corporation, and an order with like finding (filing 32) as to Frank D. Rubel was made on January 15, 1957. Respecting the second contention, it is simply recalled that notice of hearing and formal hearing are not made prerequisites to such an order or finding. United States v. Standard Oil Company, C.C.E.D.Mo., 152 F. 290, 292.

■ Then each of the two defendants now under discussion objects that it or he, as the case may be, has not been validly served with process within this District. That, of course, is true. Neither has been served at all within this district. But it was not, and is not, nec-essary that either be served here, supra. (See Title 15 U.S.C.A. § 22, with relation to Central States Theatre Corporation, and Title 15 U.S.C.A. § 5, as to Frank D. Rubel.)

With exceptions that are presently inapplicable, Title 15 U.S.C.A. § 1, provides that:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

The exceptions, and a concluding section defining a violation of the foregoing provision as a misdemeanor, and prescribing a penalty for it under the criminal law, complete the section.

By Title 15 U.S.C.A. § 4, there is erected the procedure whereby the United States may effect the prevention or restraint of the violation of the provision of Title 15 U.S.C.A. § 1. It follows:

"4. Jurisdiction of courts; duty of district attorneys; procedure

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 of this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

It is under the latter section that this action was brought and is pending, supra.

■ Title 15 U.S.C.A. § 1, has frequently been construed and applied. Some twenty years after the enactment of the statute, in Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 518, the Supreme Court held that, construed in "the light of reason," it makes unlawful all contracts and combinations which amount to an unreasonable or undue restraint of trade in interstate commerce. Though frequently criticized as a palpable dilution of the plain and unambiguous language of the statute, thus the judicial amendment of a congressional act, that court's construction then made remains broadly effective. It has, however, undergone clarification in later rulings of the same court. Thus, the test of unreasonable or undue restraint has occasionally been resorted to by some litigants on the assumption that it supports the thesis that no violation of the statute occurs unless a determined minimum amount or percentage of a particular interstate traffic or trade is affected. But that view has been rejected. And it has been held that Title 15 U.S.C.A. § 1, supra, makes unlawful all unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected. And it has been established that it is the nature of the restraint, and its effect on interstate commerce, and not the amount of the commerce, which are the tests of its violation. United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 225, note 59, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Company v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311; United States v. Yellow Cab Company, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; White Bear Theatre Corporation v. State Theatre Corporation, 8 Cir., 129 F.2d 600, 605; United States v. Paramount Pictures, Inc., 334 U.S. 131, 173, 68 S.Ct. 915, 92 L.Ed. 1260; and United States v. Griffith, 134 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.

■ That interstate commerce is involved in the leasing of moving pictures for exhibition in the Omaha area Drive-In Theatres, their transportation to, withdrawal for exhibition from, and return to the Omaha offices of the several motion picture distributors, and their handling in successive transportations into and out from Omaha for numerous exhibitions, while they remain within the reach and control of the distributors' Omaha offices [18] appears to be settled. United States v. Crescent Amusement Company, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Interstate Circuit Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 309, 44 S.Ct. 96, 68 L.Ed. 308 (which originated in this court); United States v. Shubert, 348 U.S. 222, 227, 75 S.Ct. 277, 99 L.Ed. 279; White Bear Theatre Corporation v. State Theatre Corporation, 8 Cir., 129 F.2d 600. And this involvement is not nullified by the circumstance that, in the course of their successive movements into the Omaha film exchanges, therefrom to one after another exhibitor in Nebraska, Iowa and South Dakota, thence back to the Omaha film exchanges, and finally from the exchanges out of the area to other offices of the distributors, the pictures occasionally "pause" for inspection in, or reshipment from, the Omaha distributors' offices, and to that limited extent "come to rest," as the defendants express it. That point was explicitly dealt with in Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 309, 44 S.Ct. 96, 68 L.Ed. 308, to mention only one of several like rulings.

And it is to be remembered that among the drive-in theatres in the Omaha area, and especially among the four represented at the February 4, 1955 meeting, were two which were located in Iowa. Any movement of pictures from the Omaha offices of distributors to either of those two theatres, or from either of those two theatres back to such

---

18. The particulars of which, having already been discussed, need not be repeated.

Omaha offices, was openly and directly made in interstate commerce.

██ Upon a slightly different subject, it is also observed that, even if it were granted that the business operations of a drive-in theatre is wholly local, that character would not be decisive in this litigation. Despite respectable authority to the contrary,[19] which is cited on this submission, it is authoritatively held that "wholly local business restraints can produce the effects condemned by the Sherman Act." United States v. Employing Plasterers Association of Chicago and Vicinity, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618; United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805; Moore v. Mead's Fine Bread Company, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145.

██ Reverting to the agreement, so far as agreement was reached, at the February 4, 1955 meeting, the court is convinced that its vital aspects were the engagement respecting minimum admission prices, and the program incident to advertising in the Omaha World Herald. Of less, and more remote, significance for present purposes were the understandings regarding the weekly wages of snack bar employees and ramp boys, and the expiration dates of labor contracts. The court is clearly convinced that the evidence does not persuasively support the plaintiff's allegation of the making of an agreement respecting refreshment prices, supra. And it is also satisfied that plaintiff's assertion of the making

of an agreement to threaten a boycott of any distributors providing pictures for exhibition in drive-in theatres at prices less than those agreed upon remains unproved. There is a reference to that subject in Mr. Good's letter, supra. But it is quite without convincing support in the evidence.

But, limited to the aspects in respect of which there was an actual contractual engagement, the agreement, by its very nature and content, was calculated and designed unduly and unreasonably to restrain trade and commerce in the motion picture industry. Its normal and natural effect, if carried into execution, would be to deny to the potential patrons of drive-in theatres in the Omaha area the opportunity to observe moving pictures at drive-in theatres at admission prices arrived at in free, unrestrained competition between the exhibitors, and to the distributors in interstate commerce of motion pictures the benefits of an open, free competitive market in the leasing for exhibition of their pictures, and finally to restrict and diminish the volume of newspaper advertisement, whereby publicity, designed to attract the attention of patrons, would be given to the exhibitors' respective programs. And a contract calculated to effect those results, without more, is by Title 15 U.S.C.A. § 1, "declared to be illegal." The illegality is not obviated by the comparative "smallness" of the commerce thus to be affected. Obviously, too, a contract of that character constitutes those who engage in its formulation a combination

19. Among which is United States v. Starlite Drive-In, Inc., 7 Cir., 20 F.2d 419, cited and urgently advanced in the briefs of counsel for the defendants. However, the present evidence is, in this court's opinion, distinguishable from the indictment struck drown in the Starlite ruling. To mention one point, it is shown here that the amount of rental receivable by distributors for films was and is, in many instances, directly dependent on the admission charges exacted by the distributors in the Omaha area. But this court also frankly acknowledges that it is quite disinclined to approve the reasoning of the Starlite case. The rulings of the Supreme Court cited in the paragraph to which this footnote is appended, of which two were rendered after the delivery of the Starlite opinion, appear to be both controlling and, in principle, pertinent to the instant factual situation, and to the impact upon interstate commerce of the agreement now before the court. And the Starlite case has not invariably been accepted without distinction. Las Vegas Merchant Plumbers Association v. United States, 9 Cir., 210 F.2d 732, 741, note 4 (rejected as authority); United States v. Stirone, 3 Cir., 262 F.2d 571, 579 (cited in support of dissent); United States v. Employing Lathers Association of Chicago and Vicinity, 7 Cir., 212 F.2d 726, 730 (distinguished).

and conspiracy in restraint of trade and commerce.

▋ Of the price fixing feature of the agreement, it should also be noted that under the Sherman Act a price fixing contract or combination is illegal *per se*. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309, 310, 76 S. Ct. 937, 100 L.Ed. 1209; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Pevley Dairy Company v. United States, 8 Cir., 178 F.2d 363. The language of Title 15 U.S.C.A. § 1, appears to be unequivocal upon that point.

As the court has already found, the activities after the meeting of February 4, 1955 of the participants in it, looking to its effective operation, were few, of brief duration, and narrowly limited in their reach. They were principally conducted, or at least initiated, by Frank D. Rubel. They included (a) his preparation and his circularization among those present at the meeting of copies of the memorandum concerning its discussion and action, with an obvious view to obtaining confirmation of the engagements of the participants, (b) at least a conference with Solomon John Francis in an effort to enlist his adherence to the program, at which Fank D. Rubel was not present, and (c) his telephone communication with, and transmittal of a copy of the memorandum to, Ralph Blank, both in the hope of Ralph Blank's joining in the arrangement. And this is also true. All of the drive-in theatres represented at that meeting maintained through the 1955 drive-in theatre season, and have since maintained, admission price policies which actually conform to the understanding arrived at in the meeting upon that question. However, they also conform to the 1954 season prices in effect in those theatres. And, as the court has already declared, it is convinced that the admission price policies of these theatres during and since the 1955 season, are attributable rather to inaction

in persisting in the 1954 price structure than to conformity to the agreement of February 4, 1955. The failure of Solomon John Francis and Ralph Blank to join in the program resolved upon at the meeting very early disclosed both the almost certain practical inoperability of the program, and its probable peril, shortly to become a reality when Ralph Blank alerted the Department of Justice to the subject.

▋ But it is not necessary in a proceeding by the United States under Title 15 U.S.C.A. § 4, to prevent and enjoin the violation of Title 15 U.S.C.A. § 1, under an agreement made, or combination or conspiracy erected, in violation of the latter section, that the United States prove, or even plead, either that the contract was actually effective through post agreement operations to, and did, accomplish its illegal purpose, or that the contracting parties possessed the power to accomplish such purpose, or that any overt act was done in furtherance of the contract. The contract or combination itself supports the proceeding. Indeed, such contracts, without more, are also sufficient to sustain criminal prosecutions. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Trenton Potteries Company, 273 U.S. 392, 47 S. Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Oil Company, Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

▋ Moreover, the partial and eventually final withdrawal, subsequent to the institution of this proceeding, of defendant, Midwest Drive-In Theatre Company from the operation of Airport Drive-In Theatre was and is inadequate to make this proceeding moot as to it. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Bates Valve Bag Corporation, D.C.Del., 39 F. 2d 162. Even if its corporate dissolution [20] were considered to have the effect of thwarting this proceeding as against

---

20. Which, not having occurred, is not considered or discussed.

it, that is not shown to have been accomplished. So far as the record discloses, it is still an existing corporation, with authority to engage in the operation of a drive-in theatre, even to resume the operation of Airport Drive-In Theatre.

 Necessarily confronted is the question whether, under all of the circumstances of the case, the court ought to enter the injunctive order prayed for, or injunctive relief at all. Upon mature consideration, the court is convinced that it would not be prudent or proper to refuse to grant injunctive relief adequate in its reach to assure obedience by the defendants, and each of them, to Title 15 U.S.C.A. § 1, and that such relief should be granted.

The making of a contract in the nature of a combination and conspiracy violative of Title 15 U.S.C.A. § 1, has been found. That finding has been made in the face of explicit and persistent denial of its existence by each of the parties defendant, and by the individuals who, in the meeting of February 4, 1955, represented the corporate defendants. If the initial engagement in the combination and conspiracy be granted or, as is the present situation, determined, it has not been formally abandoned. That is not surprising. The participants in it could hardly deny that any combination or conspiracy was ever formed yet, in the next breath, assert that such a combination or conspiracy was abandoned or terminated. And the defendants hereto are not thus inconsistent. The combination or conspiracy, therefore, is to be regarded as persisting. That conclusion is not nullified or impaired by the failure of the parties to it actively to carry it forward to effect. Considerations of prudence undoubtedly deterred them from decisive acts in furtherance of their engagements.

Meanwhile, all of the defendants are still in existence and, with the exception of Midwest Drive-In Theatre Company, engaged in the operation or management—or both—of the several theatres whose supposed interests inspired the meeting of February 4, 1955. The court has already mentioned in this connection the position presently occupied by Midwest Drive-In Theatre Company. As to all of the defendants, they remain in positions in which they are able to, and unless restrained, may be expected to, take active steps to set their program on foot. And their engagement of February 4, 1955 sufficiently reflects their will to do it, if and when they shall suppose that they may proceed with impunity.

Good reason appears, therefore, to exist for the entry of an injunctive order designed to prevent the further violation of Title 15 U.S.C.A. § 1. A judgment and decree to that end will be made and given.

In its terms, the judgment and decree of the court will first adjudge and decree the combination and conspiracy herein found to exist to be in violation of Title 15 U.S.C.A. § 1, as requested in paragraph numbered 1 of the complaint's prayer. It will then grant the injunctive relief asked for in paragraph numbered 2 of such prayer. Finally, it will tax the costs of this proceeding against the defendants.

Counsel for plaintiff will forthwith prepare and submit to counsel for the defendants a form of judgment and decree in accordance herewith, for examination and approval as to form, or for suggested revision or amendment; and, upon approval as to form, shall submit the same to the court for entry and filing; or if defendants' counsel shall tender objections to form or suggestions of revision or amendment, shall submit the proposed form of judgment and decree, along with such objections and suggestions, or either or any thereof, to the court for settlement, and for the entry and filing of the judgment and decree, as settled.

The clerk will transmit forthwith by United States mail copies of this memorandum to counsel.